# Third District Court of Appeal

## State of Florida

Opinion filed March 15, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-1662
Lower Tribunal No. 13-11975
_____

**Anthony Sampson,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Richard L. Hersch, Judge.

Carlos J. Martinez, Public Defender, and Robert Kalter, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Keri T. Joseph, Assistant Attorney General, for appellee.

Before SALTER, EMAS and FERNANDEZ, JJ.

EMAS, J.

Anthony Sampson appeals his convictions and sentences for second-degree murder, armed robbery and grand theft.

Sampson was charged by information with second-degree murder with a deadly weapon, burglary, robbery with a deadly weapon, and grand theft of a vehicle. Sampson acknowledged that he took valuables from the victim's home and stole the victim's car. However, Sampson's defense at trial was that he was guilty only of the lesser included charges of manslaughter (rather than second-degree murder) and theft (rather than robbery). Following the trial, Sampson was convicted of second-degree murder, robbery and grand theft.[1]

On appeal, Sampson contends that certain comments made by the prosecutor during closing arguments (which comments were either not objected to or were otherwise not properly preserved), constituted fundamental error, requiring a new trial. We affirm, concluding that the prosecutor's arguments, while improper, did not constitute fundamental error. However, we find it necessary to write to address once again another instance in which improper comments have been made by a prosecutor in the course of closing argument. In doing so, we wish to emphasize to counsel that our affirmance of the convictions in no way validates such misconduct nor somehow renders it merely "awful but lawful."

_____

[1] Sampson was acquitted of the burglary charge.

As a general rule, the failure to raise a contemporaneous objection to improper closing arguments waives appellate review of error on that basis. McDonald v. State, 743 So. 2d 501, 505 (Fla. 1999). The sole exception to this procedural bar requires the defendant to establish the improper comments constitute fundamental error. Id. Because the defense failed to object or otherwise properly preserve all of the allegedly improper comments, Sampson must establish that these comments cumulatively constitute fundamental error. Brooks v. State, 762 So. 2d 879, 898-99 (Fla. 2000) (holding that, in analyzing whether improper closing arguments require reversal, the court "considers the cumulative effect of objected-to and unobjected-to comments when reviewing whether a defendant received a fair trial"). See also Braddy v. State, 111 So. 3d 810 (Fla. 2012); Servis v. State, 855 So. 2d 1190 (Fla. 5th DCA 2003). Such a review also includes consideration of whether the improper comment was repeated, and whether the jury was provided with an accurate statement of the applicable law after the improper comment was made. Kaczmar v. State, No. SC13-2247 at *7 (Fla. Jan. 31, 2017); Poole v. State, 151 So. 3d 402, 415 (Fla. 2014).

As the Florida Supreme Court has acknowledged: "To justify not imposing the contemporaneous objection rule, 'the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained

3

without the assistance of the alleged error.'" State v. Delva, 575 So. 2d 643, 644-45 (Fla. 1991) (quoting Brown v. State, 124 So. 2d 481, 484 (Fla. 1960)).

Further, when the error is caused by improper closing argument, we must resist the "temptation for both trial courts and appellate courts to use the remedy of a new trial as a tool to punish misconduct of an attorney." Murphy v. Int'l Robotic Sys., Inc., 766 So. 2d 1010, 1029 (Fla. 2000) (quoting Hagan v. Sun Bank of Mid-Florida, 666 So. 2d 580, 584 (Fla. 2d DCA 1996)). Instead, we must recognize that, absent an allegation of bad faith or intentional misconduct, our analysis must focus primarily on the prejudicial impact of the "message" rather than on the unprofessionalism of the "messenger."

Upon our review of the entire closing argument, including the nature and number of the improper comments, the context in which they were made, and statements of law accompanying the improper arguments, we cannot say that these improper comments reached down into the validity of the trial such that a conviction could not have been obtained in the absence of these errors. See Bell v. State, 108 So. 3d 639 (Fla. 2013); Doorbal v. State, 837 So. 2d 940, 957 (Fla. 2003); Bertolotti v. State, 476 So. 2d 130, 133 (Fla. 1985); Augustine v. State, 143 So. 3d 940 (Fla. 4th DCA 2014).

Nevertheless, we set forth in greater detail two arguments complained of, in the hope that the discussion which follows can provide future guidance to attorneys.

**GOLDEN RULE ARGUMENT**

> [PROSECUTOR]: Take this journey with me please. Bear with me. Think about what Casey's going through fighting for his life. Fighting for his life. [Pauses for sixty seconds.] There's one. One minute. That was one minute.
>
> **Everybody on this jury has been swimming before, I presume, or has been underwater before where you get to that point where you're losing breath and you need to get to the surface. And you get that heavy feeling in your chest. And it feels so good when you get up to the surface and finally get a breath of fresh air.**
>
> **Well, that's what Casey was doing that day. He was looking for that breath of fresh air and couldn't breathe. And Dr. Lew told you five minutes when the brain is dying – she described his death.**
>
> And I hate next of kin has to hear it. She said it would have been a painful death. **She said it would have been very, very painful. The process she said that the body goes through when it struggles for air is painful. It's miserable. It's torturous. Casey Sigler went through that process before he died.**

(Emphasis added.)

The State initially contends the prosecutor was permitted to make these arguments because there was a factual basis in the testimony for it: the medical

5

examiner testified to the fact that it took several minutes of extreme pressure for the victim to die from strangulation at the hands of the defendant and that the victim's neck was broken and he suffered trauma that caused bruising and swelling.

But the mere fact that there is a factual basis in the testimony does not mean an attorney is free to argue that evidence in an improper manner or for an improper purpose. In light of the evidence, it certainly was proper to argue that the death by strangulation took several minutes, during which the victim was likely fighting and struggling for breath. Such an argument could be made for the purpose of showing that Sampson acted with ill will, hatred, spite or evil intent—thus supporting a verdict of guilty for second-degree murder rather than manslaughter. In point of fact, the prosecutor <u>began</u> this portion of his closing with what appears to be a proper argument:

> Take this journey with me please. Bear with me. Think about what Casey's going through fighting for his life. Fighting for his life. [Apparent pause in argument for sixty seconds.] There's one. One minute. That was one minute.

Had he then argued to the jury that during this time, Sampson continued to strangle Casey as he struggled and fought for his life (thereby evidencing Sampson's ill will, hatred, spite or evil intent in support of second-degree murder) we surely could find no fault in such an argument, as the prosecutor would be

6

arguing the evidence, its reasonable inferences, and the law, in a proper manner and for a proper purpose.

But this is not what the prosecutor did. Instead, he asked the jurors to place themselves in the shoes of the victim and to feel the very pain, suffering and desperation the victim felt just before his death:

> **Everybody on this jury has been swimming before, I presume, or has been underwater before where you get to that point where you're losing breath and you need to get to the surface. And you get that heavy feeling in your chest. And it feels so good when you get up to the surface and finally get a breath of fresh air.**
>
> **Well, that's what Casey was doing that day. He was looking for that breath of fresh air and couldn't breathe. And Dr. Lew told you five minutes when the brain is dying – she described his death.**
>
> And I hate next of kin has to hear it. She said it would have been a painful death. **She said it would have been very, very painful. The process she said that the body goes through when it struggles for air is painful. It's miserable. It's torturous. Casey Sigler went through that process before he died.**

The State alternatively contends that this was proper closing argument, citing <u>Mosely v. State</u>, 46 So. 3d 510 (Fla. 2009) in support of its position. In <u>Mosely</u>, the prosecutor made the following argument:

> From the testimony of the Medical Examiner, [Lynda Wilkes] did not go unconscious right away. Lynda Wilkes was on the ground, looking up at that man, that face, someone she trusted, knowing that she wasn't

7

> leaving Armsdale [the killing site]. <u>She had the opportunity to contemplate her own death and he went on as the Medical Examiner told you approximately four minutes to kill someone by strangulation, much less to render them unconscious, but to kill them a tremendous amount of time and force and constant pressure and constant intent.</u>

<u>Id.</u> at 521 (emphasis added).

The Florida Supreme Court found this argument was proper, but for reasons that are entirely inapplicable to the instant case. <u>Mosely</u> was a capital case, and the jury had already found the defendant guilty of first-degree murder. The above argument in <u>Mosely</u> was made during the penalty phase, and one of the aggravating factors relied upon by the State (and for the jury to consider) was that the murder was "especially heinous, atrocious or cruel." <u>See</u> § 921.141(6)(h), Fla. Stat. (2004). In finding this penalty phase argument was proper, the <u>Mosely</u> Court observed:

> [T]hose comments **were directly relevant to the HAC aggravator and** <u>had a factual basis in the testimony of both Griffin [the accomplice] and the medical examiner</u>. A prosecutor may make comments describing the murder where these comments are based on evidence introduced at trial <u>and are relevant to the circumstances of the murder or relevant aggravators</u>, so long as the prosecutor does not cross the line by inviting the jurors to place themselves in the position of the victim.

<u>Mosely</u>, 46 So. 3d at 521 (emphasis added).

By contrast, in the instant case there was no relevant purpose for the prosecutor asking the jury to consider the victim's pain, suffering and sense of desperation before he died. Mosely thus has no application here. Moreover, by asking jurors to feel the pain and suffering felt by the victim prior to his death, the prosecutor did precisely what Mosely condemned—"cross[ed] the line by inviting the jurors to place themselves in the position of the victim." Id. The prosecutor's comments in this case were classic (and classically improper) Golden Rule argument. See, e.g., Doorbal, 837 So. 2d at 957 (Golden Rule violation where prosecutor argued: "Remember [the police detective who] came in and showed you how that Omega taser works. Many of you jumped. Can you imagine how that would feel on your skin right up close? How it felt on [the victim's] sweating legs and ankles. But, again and again until he signed over everything. Signed over his entire life."); Davis v. State, 604 So. 2d 794, 797 (Fla. 1992) (Golden Rule violation where prosecutor argued: "[I]t might not be a bad idea to look at [the knife] and think about what it would feel like if it went two inches into your neck."); Garron v. State, 528 So. 2d 353, 358-59 (Fla. 1988) (Golden Rule violation where prosecutor argued: "Imagine the anguish and pain that [the victim] felt as she was shot in the chest and [dragged] herself from the bathroom into the bedroom where she expired."); Bertolotti, 476 So. 2d at 133 (Fla. 1985) (Golden

9

Rule violation where prosecutor "invit[ed] the jury to imagine the victim's final pain, terror and defenselessness.")

## MISCARRIAGE OF JUSTICE ARGUMENT

The prosecutor also argued that it would be a "miscarriage of justice" if the jury returned a verdict of manslaughter, as opposed to second-degree murder.[2] On

---

[2] For example, the prosecutor argued:

> [PROSECUTOR]: Through his words and actions, you can get inside his mind. And I submit to you, when you do that you realize this isn't merely a manslaughter. This is more than manslaughter. **It would be a miscarriage of justice to this court, to yourself, to the next of kin that is sitting here, and to everybody who believes in this system.**
>
> . . . .
>
> [PROSECUTOR]: It would be a miscarriage of justice to go in that jury room and say "You know what, this was a minor attack. This doesn't raise to the level of murder. This is manslaughter." Because this case is not manslaughter.
> . . . .
>
> [PROSECUTOR]: For you to mitigate that process with the feeling that "Well, you know, he feels bad, so I'm going to cut him a break," again that would be a miscarriage of justice. **If you are going to feel bad for anybody, feel bad for Casey. He died a horrible death. Horrible death.**

Immediately after making these comments, the prosecutor reminded the jury about a discussion that was held during jury selection:

> We talked a little bit before—we get into the law here. We talked a little bit on jury selection about sympathy

10

appeal, the State contends that this "miscarriage of justice" argument is proper because this phrase is included in the standard jury instructions read by the trial court to the jury. Indeed, Florida Standard Jury Instruction (Crim.) 3.10 (Rules for Deliberation) provides in relevant part:

> You must follow the law as it is set out in these instructions. <u>If you fail to follow the law, your verdict will be a miscarriage of justice.</u> There is no reason for failing to follow the law in this case. All of us are depending upon you to make a wise and legal decision in this matter.

(Emphasis added.)

However, it is overly simplistic to conclude that, just because the trial court instructs the jury in this regard, <u>any</u> "miscarriage of justice" argument is fair game. In <u>Braddy</u>, 111 So. 3d at 841, the Florida Supreme Court addressed a "miscarriage of justice" argument similar in some respects to that made by the prosecutor in the instant case. Braddy was charged with first-degree murder and the defense argued to the jury that the evidence supported only a lesser-included offense. In response, the prosecutor argued to the jury:

> versus common sense. Ladies and gentlemen, we're all sympathetic people. Again, you can feel bad for Casey, you can feel bad for the defendant for this position he's put himself in, you can feel bad for this courtroom, you can feel bad for the attorneys. That perfectly acceptable. And that's good. That means you're good people. But that can't affect your decision.

11

[STATE]: The defendant intended to kill her. He intended to kidnap her. He intended to kill her. To find him guilty of anything less than intentional premeditated first-degree murder, either by premeditation or felony would be to minimize what occurred.

[DEFENSE]: Objection, Your Honor.

[THE COURT]: All right. The objection is sustained. Rephrase it please.

[STATE]: <u>To find him guilty of anything less would not be supported by the evidence, and it would be a miscarriage of justice</u>.

Id. (Emphasis added.)

As in the instant case, the defense in <u>Braddy</u> failed to object to the "miscarriage of justice" reference. Although the Florida Supreme Court held that this single remark, in context, was not error (or if error, was harmless), the Court addressed the larger potential prejudice when such arguments are made:

> It is—at least in some contexts—reversible error for a prosecutor to "exhort the jury to 'do its job,' " because "that kind of pressure ... has no place in the administration of criminal justice." <u>United States v. Young</u>, 470 U.S. 1, 18, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). Similar concerns regarding improper pressure on the jury are raised here by the prosecutor's suggestion that finding Braddy guilty of a lesser offense rather than first-degree murder "would be a miscarriage of justice." <u>See</u> <u>United States v. Ingraldi</u>, 793 F.2d 408, 415–16 (1st Cir.1986) (accepting government's concession that prosecutor's "statement that it would be 'a miscarriage of justice to acquit' " was improper).

Id.

As can be seen from the discussion in <u>Braddy</u>, the propriety of such an argument must be analyzed in its individual context. In the instant case, the prosecutor made at least one appropriate "miscarriage of justice" argument, given the context in which it was made.[3] However, the prosecutor's argument to the jury

---

[3] The prosecutor made the following argument in the context of applying the standard jury instructions on lesser-included offenses (Fla. Std. J. Inst. (Crim.) 3.4), rules for deliberation (Fla. Std. J. Inst. (Crim.) 3.10) and the verdict form (Fla. Std. J. Inst. (Crim.) 3.12) to the evidence in the case:

> [PROSECUTOR]: [I]t is your duty when you're deliberating to review the evidence, make a determination that the State has proved the case beyond a reasonable doubt, prove each and every element of the crimes that are charged.... [Y]ou should find the defendant guilty of the highest crimes that the State has proved.
>
> . . . .
>
> [PROSECUTOR]: Now the judge is going to give you a very important instruction. And it's going to say that ladies and gentlemen, as sworn jurors in this case, you have a duty—you have a duty to render a verdict of the highest most severe charges the State has proven. Okay? Which means it would be—it would be unlawful, it would be a miscarriage for you to go back there and say, "Well, I think they've proven murder, but let's throw a bone. Let's do manslaughter." That would be a miscarriage of justice.

This argument, and the single reference to miscarriage of justice for failing to follow the law in this context, does not appear to us to be improper, as it is an appropriate discussion of the interplay between the relevant instructions on the law, the evidence introduced at trial, and the reasonable inferences therefrom.

that "[i]t would be a miscarriage of justice to this court, to yourself, to the next of kin that is sitting here, and to everybody who believes in this system" exhorts the jury to do its job and is improper. It is also improper to invoke a miscarriage of justice argument as a strawman to evoke sympathy for the victim ("For you to mitigate that process with the feeling that 'Well, you know, he feels bad, so I'm going to cut him a break,' again that would be a miscarriage of justice. If you are going to feel bad for anybody, feel bad for Casey. He died a horrible death. Horrible death.") These arguments improperly cross the line by exhorting the jury to "do justice" for the victim and his next of kin, and by appealing to the jury's sympathy, emotions, and sense of community conscience or civic responsibility. See Cardona v. State, 185 So. 3d 514 (Fla. 2016); Braddy, 111 So. 3d at 843; Ruiz

---

Of course, assessing the propriety of these arguments is complicated by the fact that the standard instruction on "miscarriage of justice" is inextricably linked to the jury's inherent pardon power, and represents an implicit effort to discourage the exercise of that power. There is no standard instruction on the jury's pardon power, which has been described as "the jury's inherent power to pardon a defendant by convicting the defendant of a lesser offense." State v. Estevez, 753 So. 2d 1, 4 (Fla. 1999). Indeed a fair reading of the standard jury instructions leaves one with the impression that a jury possesses no such power. But the jury's pardon "power" is not the equivalent of a jury's pardon "authority" because the exercise of the pardon power is necessarily in contravention of the law upon which the jury is instructed to rely, and a violation of the oath they take as jurors. See Sanders v. State, 946 So. 2d 953, 957-58 (Fla. 2006); Fla. R. Crim. P. 3.360 (requiring jurors to take an oath to "well and truly try the issues between the State of Florida and the defendant and render a true verdict according to the law and the evidence. . . ."). Thus, a "miscarriage of justice" argument exposes the uneasy tension between the jury's avowed obligation to follow the law and its unspoken power to disregard it.

v. State, 743 So. 2d 1 (Fla. 1999); Birren v. State, 750 So. 2d 168 (Fla. 3d DCA 2000); Del Rio v. State, 732 So. 2d 1100 (Fla. 3d DCA 1999); Brinson v. State, 153 So. 3d 972 (Fla. 5th DCA 2015); Smith v. State, 818 So. 2d 707 (Fla. 5th DCA 2002).

The concerns we express here are not new. Sadly, our appellate courts have for decades expressed consternation over the recurring misconduct of attorneys during closing arguments. See, e.g., Bertolotti, 476 So. 2d at 133 (observing: "[W]e are deeply disturbed as a Court by the continuing violations of prosecutorial duty, propriety and restraint. . . . This Court considers this sort of prosecutorial misconduct, in the face of repeated admonitions against such overreaching, to be grounds for appropriate disciplinary proceedings. It ill becomes those who represent the state in the application of its lawful penalties to *themselves* ignore the precepts of their profession and their office"); Mora v. State, No. 3D15-1434 *1 (Fla. 3d DCA Feb 15, 2017);[4] Bell v. State, 723 So. 2d 896 (Fla. 2d DCA 1998) (observing: "We continue to be concerned when trial counsel make improper

---

[4] The Mora court observed: "This is not a new problem. See, e.g., Jackson v. State, 421 So. 2d 15, 16 (Fla. 3d DCA 1982). Although the State Attorney's Office prosecutes these cases, the regional office of the Attorney General of Florida is required to handle any resulting appeals. One imagines that improper argument of this kind might diminish if the prosecutor who created the issue at trial was required to research and write the appellee's brief, and then argue the appeal here. In-service trainings between the two offices might also mitigate the problem. . . . For some time, this court has been faced with a veritable torrent of cases which have similarly involved significant prosecutorial improprieties committed by assistant state attorneys in this district."

15

arguments to a jury. At times it seems as if certain counsel consider the harmless and fundamental error rules to be a license to violate both the substantive law and the ethical rules that prohibit improper argument"); Luce v. State, 642 So. 2d 4 (Fla. 2d DCA 1994) (Blue, J., concurring and observing: "I write because I am disturbed by the increasing number of improper arguments appearing in the trial records that come before this court in both criminal and civil cases. I understand the role of the advocate. I understand that advocates worth their salt wish to win. However, the courtroom is not an arena for testing the relative strengths of gladiators; it is the place where citizens of our state expect to settle disputes in a manner more civilized than hand-to-hand combat. . . . Trial attorneys must avoid improper argument if the system is to work properly. If attorneys do not recognize improper argument, they should not be in a courtroom. If trial attorneys recognize improper argument and persist in its use, they should not be members of The Florida Bar.")

That such misconduct persists, despite these clarion calls, deepens our disquiet. The fact that the prosecutor's misconduct has weathered the storm of our direct review, while certainly not beside the point, is also clearly not the entire point. We remind all attorneys of their solemn oath and their ethical obligation to the court, the justice system, and to the individuals and entities they represent.

16

And in particular, we remind prosecutors of the special obligation that accompanies their position, for an assistant state attorney

> is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor-indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935).

Affirmed.